

**ORDERED in the Southern District of Florida on February 11, 2022.**



**Erik P. Kimball, Judge**
**United States Bankruptcy Court**

---

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

In re:

**MARTIN A. TABOR and ABBY TABOR,**

    Debtors.

_____/

**HEARTWOOD 4, LLC and DEBORAH C.**
**MENOTTE, Chapter 7 Trustee,**

    Plaintiffs,

v.

**MARTIN A. TABOR and ABBY TABOR,**

    Defendants.

_____/

**CHAPTER 7**
**CASE NO.:14-20731-EPK**

**ADV. PROC. NO.:15-01616-EPK**

## <u>MEMORANDUM OPINION</u>

    The Court held trial in this adversary proceeding on March 2, 3, 9, and 13, 2020, and

July 22 and 23, 2021.[1]  The parties presented lengthy closing arguments on August 5, 2021.

---

[1] Because of the pandemic, trial in this adversary proceeding was delayed for a significant period.
The plaintiffs had nearly completed presentation of their case in chief in March 2020 when the Court

At the Court's direction, the parties filed post-trial briefs.  ECF Nos. 599, 612, 620.  The Court carefully reviewed the record in light of the post-trial briefs.[2]  The following constitutes the Court's findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052.

## SUMMARY OF RULING

Plaintiffs Heartwood 4, LLC, an unsecured creditor with claims based on commercial loan guarantees, and Deborah C. Menotte, chapter 7 trustee, seek denial of discharge for both debtors, Martin and Abby Tabor.  Although the chapter 7 trustee remains a plaintiff in this case, Heartwood took the laboring oar at trial and in post-trial briefing.

In the operative Third Amended and Supplemental Complaint Objecting to Discharge [ECF No. 437] (the "Third Amended Complaint"), the plaintiffs allege that Mr. and Mrs. Tabor concealed material assets (counts I and II under section[3] 727(a)(2)(A) and count III under section 727(a)(2)(B)), failed to preserve appropriate records relating to their assets (count IV under section 727(a)(3)), made false statements under oath (count V under section 727(a)(4)), and failed to satisfactorily explain a loss of assets (count VI under section 727(a)(5)).

The plaintiffs allege that Mr. Tabor orchestrated a Machiavellian series of transactions, using an irrevocable spendthrift trust set up years before, over which Mr. Tabor

---

ceased in-person hearings and transitioned to hearings and trials by video conference.  The parties repeatedly asked the Court not to conclude the trial by video conference as they perceived this to be unfair to the defendants.  As a result, the Court did not complete the trial until summer 2021 when infection rates appeared to recede and the Court resumed in-person trials for a time.  Post-trial briefing was completed on November 8, 2021.

[2] In the briefing order, the Court directed the parties to file briefs in the form of proposed findings of fact and conclusions of law.  The Court advised the parties that each statement of fact in the proposed findings of fact must be supported by a specific reference to documentary evidence admitted or testimony given at trial or the Court may disregard the statement of fact and the party will be deemed to have waived the right to rely on such statement of fact.  ECF No. 599.

[3] The words "section" or "sections" refer to the stated provisions of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*

allegedly maintained control, and transfers through Mr. Tabor's sister, the Tabors' adult daughter and sons, and one son's former mother-in-law, all aimed at hiding the Tabors' assets from their creditors and funneling such assets for the Tabors' personal benefit. Each of the claims in counts I, II, and III require the plaintiffs to convince the Court that Mr. and/or Mrs. Tabor acted with actual intent to hinder, delay, or defraud a creditor.

Stories such as this are common in adversary proceedings challenging the discharge. For two reasons this case is unique.

First, Mr. and Mrs. Tabor's defense is overwhelmingly supported by their own testimony and that of their three adult children, Mr. Tabor's sister, the trustee of the family trust, and the former mother-in-law of one of the Tabors' sons. The plaintiffs ask the Court to find none of these witnesses credible. Indeed, for the plaintiffs to be successful, the Court would need to disbelieve each of these witnesses to some extent and, in certain instances, would need to find a great deal of their testimony deceitful. But the Court found all of them consistently credible. The plaintiffs attempt to shoot holes in certain of the testimony by pointing to seeming inconsistencies, both during trial and in testimony prior to trial. Having observed the live testimony, having carefully reviewed the record after trial, and taking into account the explanations provided by the Tabors during trial, during closing argument, and in their brief, the Court finds that each of the alleged inconsistencies was adequately explained or was not material. The testimony elicited by the plaintiffs during their own case in chief indicated the Tabors have the benefit of an honorable and loving family who consistently did their best to assist Mr. and Mrs. Tabor, using assets they could use for any purpose they wished, and not the complex conspiracy imagined by the plaintiffs. Likewise, the Court believed Mrs. Tabor's testimony that when she took a loan on her aging but previously unencumbered car, she did so only to support the household finances in a time of

need.  Indeed, she had already sold her valuable engagement ring and other jewelry for the cause and had little else to offer.

Second, in cases presenting similar claims, it is typically apparent that the hidden assets were used to facilitate the continued extravagant lifestyle of the debtor to the detriment of creditors.  In this case, the evidence tells a very different story.  The majority of the assets supposedly funneled away from creditors were used by Mr. Tabor's remaining real estate projects.  A significant portion of those funds went to pay lenders who were also creditors of Mr. and Mrs. Tabor under personal guarantees.  In other words, much of the funds the plaintiffs allege that Mr. and Mrs. Tabor concealed actually went to pay their creditors -- including Heartwood's predecessor.  Tellingly, the plaintiffs do not argue that the Tabors hid assets in order to support excessive personal spending.  This is because the Tabors did not live a lavish lifestyle, particularly after it was clear that Mr. Tabor's business was suffering.  Instead, they focused on trying to keep Mr. Tabor's real estate deals alive in hopes they would be able to pay all their creditors and on covering their basic expenses.  None of this is consistent with the plaintiffs' view that Mr. and Mrs. Tabor facilitated a scheme harmful to creditors.  The Tabors lacked the intent necessary for the plaintiffs to obtain relief under counts I, II, and III.

During closing argument, the plaintiffs explicitly waived relief under count IV for failure to preserve appropriate records.  Even if they had not, the Tabors maintained appropriate records regarding the disposition of the assets that were the focus of the claims in count IV.  On count V, the evidence indicates that the alleged false statements made under oath were not actually false, were not knowingly false when made, were not material, or a combination of these.  On count VI, the Tabors adequately explained to the satisfaction of the Court why they did not have the subject assets at the time they filed their bankruptcy petition.

The plaintiffs failed to meet their burden of proof on counts I, II, III, V, and VI, waived relief under count IV, and did not meet their burden under count IV even if they had not waived those claims.  In the Court's view, after careful consideration, the evidence presented did not come close to satisfying the plaintiffs' burden on any of the claims presented.  As more fully discussed below, the Court will deny all relief under the Third Amended Complaint (as amended post-trial herein) and will enter separate judgment in favor of the defendants, Martin and Abby Tabor.

## FINDINGS OF FACT

**The Tabor Family**

Mr. and Mrs. Tabor were married in 1966.  At the time of their bankruptcy filing, they were both retirement age.  They have three adult children: Tracy Shelowitz, Scott Tabor, and Brett Tabor.  Mr. Tabor has a sister, Shelley Kirschenbaum, who at all relevant times lived with her spouse, Gene, in Connecticut.[4]

The Tabors have a reputation for generosity toward family, both their immediate family and extended members of their family.  For example, when Mr. Tabor's brother-in-law Gene was in medical school, the Tabors sent money to Shelley to help them make ends meet. When the Tabors later learned that Gene had applied for a residency in Miami, they bought a condo for Shelley and Gene's use, even though in the end Gene took a residency in California.  In 2007, when their son Scott's first wife, Yahel, had surgery for a brain tumor, they assisted Scott's mother-in-law, Mercedes Guzman, then living in Mexico, by finding her a home and work in Florida so that she could be with her daughter.  The Tabors lent Mercedes funds to purchase her Florida home and hired her to perform maintenance work for one of Mr. Tabor's real estate projects.  In turn, Mercedes assisted in caring for Mr. Tabor's aging

---

[4] For ease of reference, the Court refers to persons other than Mr. and Mrs. Tabor by their first names.

mother, Bernice Tabor, without pay.  Mercedes continued to do so for more than 7 years until Bernice's death in 2015, even after Scott and Yahel divorced in 2012.  The testimony was replete with stories such as these, which the Court found both credible and useful to understanding the motivations of Mr. and Mrs. Tabor and other persons relevant to this case.

**Mr. Tabor's Real Estate Business**

Over a period of decades, Mr. Tabor had a successful career as a real estate developer and broker, working on large commercial and residential projects in Florida.  Mr. and Mrs. Tabor amassed a net worth that peaked over $40 million.  Mrs. Tabor was not involved in Mr. Tabor's development projects and had no knowledge of the operations or finances of his business.  Mrs. Tabor's only exposure was to join Mr. Tabor in personally guaranteeing certain commercial loans.

As of 2008, 6 years before this bankruptcy case was filed, Mr. Tabor was involved in several real estate projects in Florida.  These are referred to in the record as Port Mayaca Plantation, Bent Pine, MT Vero Holdings, and Vero 95.  Port Mayaca Plantation involved redeveloping thousands of acres of former sugar cane plantation in Martin County into large home sites for a polo and equestrian community.  Mercantil Commerce Bank was the primary lender on Port Mayaca Plantation.  Bent Pine involved development of a 90-acre parcel in Vero Beach, Florida as a gated residential community.  Banco Popular was the primary lender on Bent Pine.  MT Vero Holdings involved development of a 180-acre parcel, also in Vero Beach, Florida, for large lot residential development aimed at owners of motor coach RVs who would winter in Florida and be able to store their RVs on site.  Banco Popular was also the primary lender on MT Vero Holdings.  Vero 95 involved development of several parcels adjacent to an existing outlet mall, again in Vero Beach, Florida, as an RV park among other potential uses.  Bank Atlantic was the primary lender on Vero 95.  Heartwood

is the successor to Bank Atlantic, having purchased the loan immediately after Bank Atlantic obtained a foreclosure judgment but prior to this bankruptcy case.

In 2008, the United States experienced a significant financial crisis which had a severe negative impact on the real estate market in Florida. As Mr. Tabor testified, commercial lending became essentially unavailable. Development ground to a halt. Mr. Tabor was unable to move forward on his existing projects, each of which carried significant debt that he and Mrs. Tabor had personally guaranteed.

Mr. Tabor spent several years attempting to maintain his existing real estate projects, in hopes that the market would rebound and he could bring them to fruition. He continued to make debt service payments as long as he could. Eventually, it became clear that the market would not recover in time to facilitate successful completion of the projects. The lenders pursued foreclosure and collection on their guarantees, and litigation ensued. At that point, Mr. Tabor turned his efforts to negotiation with the lenders, Banco Popular, Mercantil Commerce Bank, and Bank Atlantic (Heartwood's predecessor). In certain instances, Mr. Tabor offered to assist in marketing the properties.

**The Tabors' Primary Creditors**

Eventually, all of the commercial lenders realized on their real estate collateral. Banco Popular did not file a claim in this bankruptcy case. Mercantil Bank and Heartwood[5] filed unsecured claims. Mercantil Bank's claim was settled and its successor withdrew the claim. Only Heartwood continues to pursue claims based on personal guarantees. Although this adversary proceeding seeks to deny the discharge in its entirety, in reality Heartwood is the only creditor attempting to collect from Mr. and Mrs. Tabor.

---

[5] In their post-trial brief, Mr. and Mrs. Tabor argue that Heartwood is not a "creditor" with the ability to bring the claims presented here. However, Heartwood filed proof of claim number 11 in this case, holds a "claim" within the meaning of section 101(5), and so is a "creditor" under section 101(10).

**The Port Mayaca Family Trust**

In 2005, several years before the economic downturn in 2008, and about 9 years prior to this bankruptcy case, Mr. Tabor settled the Port Mayaca Family Trust with an initial deposit of $119,000. The Trust is an irrevocable spendthrift trust for the benefit of the Tabors' children, Tracy, Scott, and Brett, and Mr. Tabor's sister, Shelley. William Gassan acts as trustee. William was employed by Mr. Tabor's development company since the early 1990s. With the $119,000, the Trust purchased three options in connection with the Port Mayaca Plantation project. The Trust exercised one of those options in 2008, netting approximately $1.7 million. As of 2008, the Trust held the net proceeds from the exercise of that first option and the two remaining, unexercised options. The two remaining options were never exercised.

**Use of Trust Assets**

During the roughly 7-year period from July 2008 through May 2015, the Trust distributed a net of about $1,506,000. About $953,000 was distributed directly to beneficiaries, meaning to Tracy, Brett, Scott, and Shelley. About $369,000 was paid in taxes. About $29,500 was paid to the Tabor Agency (an entity discussed below), with about $16,750 of that being made available to Mr. Tabor. About $994,000 was loaned to Mr. Tabor's real estate businesses, for which loans the Trust was later repaid about $844,000, leaving a net loss on the loans of about $150,000. The remainder, about $5,000, represents losses on transactions involving a home used by Scott's family.

Of the approximately $953,000 that the Trust distributed to beneficiaries during that 7-year period, the beneficiaries made available to Mr. and Mrs. Tabor about $498,000, or an average of about $71,000 per year. None of this sum was paid directly to Mr. or Mrs. Tabor. For example, Tracy and Shelley used about $345,000 of their distributions to make loans and gifts to Mercedes, and Mercedes used about $285,000 of that to repay Mr. and Mrs. Tabor on

8

the loan they had given her to buy her home.  In other words, of the $498,000 in Trust assets that made it to Mr. and Mrs. Tabor, $285,000 of that sum came via Mercedes and in turn from Tracy and Shelley.

The Tabors' income for the roughly 6-year period from July 2008 to the petition date in May 2014 came from funds ultimately sourced from the Trust, social security, proceeds from the sale of Mrs. Tabor's engagement ring and certain other jewelry, and from Mrs. Tabor borrowing against her previously unencumbered, aging vehicle.  The Court found credible the testimony of Mr. and Mrs. Tabor, William, Tracy, and Shelley that Mr. and Mrs. Tabor did not realize that Trust assets were being used to assist them in their time of need.  They did not learn the truth until later.

During the roughly 7-year period from July 2008 through May 2015, the Trust beneficiaries -- meaning Tracy, Scott, Brett, and Shelley -- received about $470,000 from the Trust, none of which directly or indirectly benefitted Mr. or Mrs. Tabor.  Thus, while the trust beneficiaries allowed a substantial portion of the Trust assets to be used for the eventual benefit of Mr. and Mrs. Tabor, they also received significant funds for their own benefit.  The sums received by the beneficiaries and used for their own benefit are comparable to the aggregate eventually used for the benefit of Mr. and Mrs. Tabor.  In addition to distributions, the Trust served other important roles for beneficiaries during this period.  For example, the Trust facilitated the acquisition of a home for Scott under circumstances where he would have been unable to obtain similar housing on his own.

**Mortgage Loan to Mercedes and Repayment**

Mercedes moved to the United States in early 2007 to help care for Yahel while Yahel recovered from brain surgery.  Mr. and Mrs. Tabor offered to assist Mercedes in finding work and a home in Florida while she studied and secured a work permit.  In 2009, to facilitate Mercedes' purchase of a home in Jensen Beach, Florida, Mr. Tabor loaned her roughly

9

$312,000 secured by a mortgage. Yahel and Briana, Scott's daughter, lived in the home with Mercedes.

Mercedes became friendly with Bernice Tabor, Mr. Tabor's aging mother, who died during the pendency of this bankruptcy case in 2015. Mercedes provided significant assistance to Bernice, on a nearly daily basis for more than 7 years, without compensation.

When the mortgage loan came due, Mercedes was unable to pay the principal owed and did not want to sell her home. At the same time, she sensed that Mr. and Mrs. Tabor were experiencing financial difficulty. Mercedes asked Tracy and Shelley for assistance. They gave Mercedes a total of $345,000 in loans and gifts. Both Tracy and Shelley testified that they gladly provided the funds, without taking a mortgage, partly out of gratitude for the care Mercedes provided to their mother. Tracy and Shelley obtained those funds from the Trust, in part so that they would not need to use marital funds for that purpose. Mercedes used $285,000 of the money she obtained from Tracy and Shelley to make payments to Mr. Tabor on the mortgage loan. Mr. Tabor forgave the remainder of the loan in consideration of work Mercedes had done on Mr. and Mrs. Tabor's homes without prior compensation. Mr. and Mrs. Tabor did not know that Mercedes had obtained the funds to pay off the mortgage loan from Tracy and Shelley or that Tracy and Shelley had obtained the funds from the Trust.

The plaintiffs ask the Court to conclude that this is both an example of Mr. Tabor controlling and using the Trust for his own purposes and an example of his hiding an asset, meaning the forgiven portion of Mercedes' mortgage loan, to the detriment of creditors. Having viewed the testimony of all involved persons, the Court is convinced that Mr. Tabor did not know that funds he received from Mercedes had come ultimately from the Trust until later. The Court finds that Mr. Tabor believed the remainder of Mercedes' mortgage loan was more than offset by work she had done without prior compensation.

**Trust Loans to Mr. Tabor's Real Estate Projects**

In 2009, Mr. Tabor's real estate projects no longer had access to funds to meet debt service or pay other legitimate business expenses. William, as trustee of the Trust, suggested that the Trust could make loans to the businesses. Both Mr. Tabor and William testified that the real estate projects had no ability to acquire capital elsewhere, unsurprising testimony given the state of the financial markets at the time. William testified credibly that making loans to Mr. Tabor's real estate enterprise made sense for the Trust in part because the Trust still held two options in connection with the Port Mayaca Plantation project. He believed it appropriate for the Trust to try to protect those investments from complete loss. No one knew at that time how long the real estate market would remain stagnant. It was clear from the testimony of all the Trust beneficiaries that they had no objection to this use of Trust assets.

Three years before, in 2006, Mr. Tabor loaned Scott $1,325,000 to purchase a home in Sailfish Point, a neighborhood in Stuart, Florida, and received a note and mortgage. Mr. Tabor advanced additional funds for improvements. At the time, Mr. Tabor and Scott agreed that when Scott sold the house, Mr. Tabor would recover his investment first and they would split any profits.

In 2009, when the Trust considered making loans to Mr. Tabor's real estate enterprise, William expressed a need for collateral to protect the Trust. As security for advances made by the Trust for the benefit of his businesses, Mr. Tabor agreed to assign to the Trust the note and mortgage on Scott's Sailfish Point home. The plaintiffs argue that the informality of the documentation for the agreement, and the delay in assigning the mortgage to the Trust, which occurred much later in the year, indicate Mr. Tabor's intent to conceal from his personal creditors the asset represented by that mortgage loan. But the evidence, as a whole, does not support that conclusion. Both William and Mr. Tabor testified credibly regarding the timeline of the agreement to have the mortgage loan serve as collateral and its eventual

11

assignment. In the context of the overall economic circumstances, the intention of the parties to try to weather the storm of the real estate downturn with the expectation that Mr. Tabor's real estate projects would eventually yield profits, and William's reasonable expectation that the Trust should not make loans without appropriate collateral, their testimony was credible.

The plaintiffs argue that William did not act appropriately as trustee in causing the Trust to make loans to Mr. Tabor's business enterprise. They argue that he had personal conflicts, as he was a 5% owner of the real estate projects and a longtime employee and friend of Mr. Tabor. They argue that the Trust had no real business purpose in making the loans as it held options in only one of the projects and the loans benefitted all three. They argue that the Trust did not need the collateral in the form of assignment of the Sailfish Point mortgage loan as there was equity in the real estate projects which received the loans. These arguments are not supported by the evidence and are internally inconsistent. William held a minor equity interest in Mr. Tabor's real estate projects, essentially the tie-breaker position in the entities that owned rights in the projects. That Mr. Tabor selected a personal friend to act as trustee for his family trust is completely unsurprising. There is no evidence that William was swayed to breach his fiduciary duty by his longstanding relationship with Mr. Tabor. Under the circumstances, these facts did not give rise to a real conflict of interest. When testifying at trial, William did not say that the goal of protecting the remaining options was the sole reason for the Trust loans, as the Plaintiffs suggest, but that it was among the reasons the Trust made the loans. The beneficiaries of the Trust, all adults, certainly did not object to the Trust attempting to preserve their father's business enterprise, potentially for their benefit if the remaining options had value. The plaintiffs' argument that the Trust did not need collateral for the loans clearly is untrue as the Trust in fact realized on that collateral and still suffered a $150,000 loss. William properly obtained collateral for the

loans.  If William had failed to obtain collateral, as the plaintiffs suggest was appropriate, that would likely have been a breach of his fiduciary duty as trustee.

During 2009, the Trust advanced a total of about $994,000 to Mr. Tabor's real estate enterprise.  Mr. Tabor hoped the new capital would give him time to find buyers or replacement financing.  While the Trust made advances directly to the account of the Vero 95 project, those advances were used in connection with all of Mr. Tabor's then existing projects.  Of the advances made by the Trust, about $180,000 was used to pay Bank Atlantic, Heartwood's predecessor.

Even with advances from the Trust, Mr. Tabor could not keep his projects alive.  In hindsight this seems inevitable, but at the time no one had experienced similar financial market disarray.  Between 2009 and 2011, creditors issued default letters and initiated proceedings to collect on over $40 million of debt the Tabors had personally guaranteed.

Mr. Tabor's business was unable to repay the advances it obtained from the Trust. Consistent with his agreement with the Trust, Mr. Tabor assigned the Sailfish Point mortgage to the Trust in December 2009.  William, as trustee of the Trust, asked Scott to put the house on the market.  Scott listed the home for sale in early 2010.  The property eventually sold in January 2012 for about $844,000, which the Trust accepted in satisfaction of the mortgage.  The plaintiffs are suspicious of the fact that the Trust failed to pursue Scott for the deficiency, about $481,000 on the original mortgage loan and possibly more if advances for improvements are included.  But the Trust had no reason to believe Scott had any ability to pay that deficiency and, indeed, Scott himself was a beneficiary of the Trust. After accepting $844,000 from the sale of its collateral, the Trust retained a loss of about $150,000 on its advances to Mr. Tabor's business.  The Trust made no further advances to Mr. Tabor's real estate projects.

**The Spiral to Bankruptcy**

Mr. and Mrs. Tabor's personal finances continued to suffer. From January 2012 to the bankruptcy filing in May 2014, the Tabors relied on loan repayments made by Mercedes, gifts from Tracy and Shelley, and a mortgage loan from Shelley. Unbeknownst to Mr. and Mrs. Tabor, all of those funds other than the mortgage loan from Shelley ultimately came from the Trust. The plaintiffs ask the Court to disbelieve the testimony of essentially all parties involved and, instead, conclude that Mr. and Mrs. Tabor always knew that these funds came ultimately from the Trust. Not only was their testimony credible on this issue, there was no reason for Mr. or Mrs. Tabor to question the ability of Mercedes and Shelley, in particular, to provide those funds. They believed that Mercedes was selling assets in Mexico and knew that Shelley had means of her own. While it appears that Mercedes did not hold significant net assets in Mexico that she could liquidate for purposes of paying off her mortgage, Mr. and Mrs. Tabor did not know this.

In the end, Mr. and Mrs. Tabor were unable to pay the substantial debts represented primarily by guaranteed commercial loans. They were forced to file chapter 7 petitions with this Court in May 2014.

**Mr. Tabor Retained No Interest in the Trust**

The plaintiffs ask the Court to conclude that Mr. Tabor retained continuous control over the Trust for his personal benefit and thus had an equitable interest in the Trust that he hid from creditors. Among other things, they point to the fact that William, Mr. Tabor's long-time employee and friend, acted as trustee, that the Trust made significant advances to support Mr. Tabor's businesses, which the plaintiffs contend was not in the interests of the Trust, and that the Trust made distributions aggregating nearly $500,000 that were paid by the Trust beneficiaries to or for the eventual benefit of Mr. and Mrs. Tabor. The plaintiffs

allege that Mr. Tabor orchestrated these payments through the Trust beneficiaries in order to hide his interest in the Trust from his creditors.

The plaintiffs' suspicions are not supported by the evidence admitted in this case. There is no evidence that Mr. or Mrs. Tabor ever requested funds from the Trust. Several witnesses, all credible, testified that the ultimate source of funds was hidden from Mr. and Mrs. Tabor. In addition to Mr. and Mrs. Tabor themselves, five separate witnesses testified on these issues – Shelley, Scott, Brett, Mercedes, and William – and they presented a consistent and believable story. During their testimony, the Court was repeatedly struck with the impression that these are good people who were trying to do the right thing for Mr. and Mrs. Tabor, using assets that they could have used for their own benefit.

Importantly, the Trust aided its beneficiaries in ways that had nothing to do with Mr. or Mrs. Tabor. During the period covered by the documentary evidence, the Trust distributed about $470,000 to beneficiaries that did not in any way benefit Mr. or Mrs. Tabor. The Trust also assisted Scott in acquiring a home that he could not have otherwise obtained at that time. While the plaintiffs challenge William's decisions as trustee, particularly in connection with advances made to Mr. Tabor's businesses, William testified credibly that he made those decisions with the best interests of the Trust and its beneficiaries in mind.

In cases where it is alleged that a debtor created a trust facially for the benefit of others, but actually retained complete control over the corpus for the debtor's own benefit, the beneficiaries often are the debtor's spouse and/or minor children. In other words, in many such cases the beneficiaries are unlikely to object, or not in a position to object, to the use of the trust for purposes beneficial only to the debtor/settlor. In this case, each of the Trust beneficiaries was an adult at all relevant times. They all testified at trial and were consistently credible. The Court did not get the impression that any of the trust beneficiaries

15

were shrinking violets.  Not once did any of them suggest that the Trust was used in a way contrary to their wishes.

The Trust is a valid, irrevocable spendthrift trust, established at a time when Mr. and Mrs. Tabor had no inkling that their financial lives would ever be at risk.  Mr. Tabor retained no control over the Trust.  Considering all of the evidence in this case, the Court concludes that Mr. Tabor had no interest of any kind in the Trust.  Mr. Tabor could not have hidden his interest in the Trust as he did not have one.

**The Tabor Agency, the Palm City Commission, and the Porsche**

Mr. Tabor's father founded the Tabor Agency decades ago in connection with a luggage sales business.  When he died, Bernice became the sole owner of the Tabor Agency, which was essentially dormant until 2013.  When Bernice died in 2015, Shelley became the sole owner of the Tabor Agency.  Mr. Tabor has never been an equity owner of the Tabor Agency.

In October 2013, Mr. Tabor was added as a signatory on the Tabor Agency's bank account, and he registered the entity as a real estate broker.  Mr. Tabor served as the qualifying broker for the Tabor Agency.  Mr. Tabor hoped that Shelley would join the Tabor Agency, as she had experience in residential brokerage, so they could start a boutique retail brokerage.  In the end, Shelley was not interested.  Mr. Tabor and Scott considered pursuing marketing and selling air purifiers using the corporate form of the Tabor Agency.  They commissioned and considered several prototype machines, but the enterprise never got off the ground.  When this bankruptcy case was filed, the Tabor Agency still had no business operations.

In 2012, after the sale of the Sailfish Point house, Scott leased a modest home in Palm City, Florida, for the benefit of Yahel and Briana.  Scott and Yahel were in the process of divorcing.  The lease included an option to purchase that Scott was financially unable to execute.  To assist Scott, the Trust purchased the Palm City home and leased it to Yahel.

16

Two years later in 2014, when Yahel determined to move to Mexico, she located a third-party buyer for the home. However, in order to permit Briana to remain in the home, Scott agreed to purchase the home from the Trust. The Trust entered into a lease with a purchase option and Scott exercised the option soon thereafter when he could obtain financing. The Trust agreed to pay a commission of $25,500 on the sale because Yahel had located the initial buyer. Yahel was an agent, but not herself a broker, so the Trust paid the commission to the Tabor Agency which split the commission with Yahel, who received $12,750. Both Scott's purchase of the property and the payment of the commission occurred after this bankruptcy case was filed.

A few months before Mr. and Mrs. Tabor filed this bankruptcy case, Mr. Tabor and the Tabor Agency co-leased a 2014 Porsche Panamera for Mr. Tabor's use. Mr. Tabor's company, Martin Tabor & Associates, traded in a 2009 Mercedes-Benz valued at $6,000 as part of the transaction. The Tabor Agency paid monthly lease and insurance payments of $1,409.09 and $270.05, respectively. Prior to this bankruptcy case, Shelley asked William, as trustee of the Trust, to pay $4,000 to the Tabor Agency for this purpose. The Tabor Agency also used the $12,750 obtained from the Palm City commission to make payments related to the Porsche.

The parties stipulated that Mr. Tabor co-leased the Porsche along with the Tabor Agency. However, at the time he filed this bankruptcy case and completed his schedules, Mr. Tabor believed that the Tabor Agency was the sole lessee, that he signed the lease for the Porsche only in a representative capacity, and so he did not list the car as an asset or otherwise schedule the lease. Mr. Tabor's testimony on this matter was credible and is supported by documentary evidence. The lease agreement in evidence shows Mr. Tabor's signature as the representative of the Tabor Agency while the space for Mr. Tabor's signature in a personal capacity is crossed out. At the start of this bankruptcy case, in 2014, Mr. Tabor

freely disclosed that he drove the Porsche and that it was leased by the Tabor Agency.  The plaintiffs argue that Mr. Tabor intentionally concealed his interest in the Porsche. Considering Mr. Tabor's credible testimony on the issue, the Court finds that Mr. Tabor did not intend to conceal or hide his interest in the Porsche because he did not realize he had such an interest to disclose.

The plaintiffs also allege that Mr. Tabor concealed an equitable interest in the Tabor Agency itself when he filed this bankruptcy case.  He was not an owner of the Tabor Agency, which at that time was solely owned by Bernice.  Mr. Tabor, Scott, and Shelley all testified credibly that ultimate control of the Tabor Agency remained with Bernice until her death during this bankruptcy case, at which point Shelley became the sole owner.  When this bankruptcy was filed, Mr. Tabor was, at most, the qualifying broker for the Tabor Agency and a signatory on its bank account, at a time when it had no ongoing business.  That the Trust determined, after this case was filed, that Yahel was entitled to a commission on the sale of the Palm City home and paid that commission to the Tabor Agency does not magically create a pre-bankruptcy business opportunity owned by Mr. Tabor, personally.  The windfall, if any, was for the ultimate benefit of Bernice, who permitted the funds to be used in part to pay the expenses of the Porsche.  To be sure, having the Porsche was a benefit to Mr. Tabor, but it was Bernice's benefit to convey.  Mr. Tabor did not have an interest in the Tabor Agency, itself, that he could hide from creditors.

**Mrs. Tabor's Jaguar**

Mrs. Tabor owned a 2008 Jaguar that was unencumbered.  In November 2013, she obtained a loan secured by the vehicle in the approximate amount of $15,000.  At the time this case was filed, the Jaguar had more than 120,000 miles and the Tabors represented that it was worth less than the balance of the loan.  Mrs. Tabor had spent her adult life caring for her family and her household.  Mrs. Tabor testified credibly that she took out the car loan

because it was a way she could obtain funds to assist the couple in meeting their daily needs. Contrary to the plaintiffs' suggestion, the balance in the couple's bank account on any particular date is not relevant.  It was obvious that Mr. and Mrs. Tabor were having trouble meeting their necessary expenses.  Mrs. Tabor also testified credibly that they had attempted to reduce their regular expenses as much as they could.  The Court finds Mrs. Tabor did not have the intent to hinder, delay, or defraud creditors when she obtained a loan on and granted a security interest in her Jaguar.

**Jewelry and Furnishings**

Six years prior to filing this bankruptcy case, in a September 2008 financial statement, the Tabors listed $850,000 under the description "jewelry and furnishings."  The plaintiffs argue that when the Tabors filed this case they listed an aggregate of less than $7,000 in value for the same categories of assets.  The plaintiffs claim that the Tabors failed to adequately explain the "loss" of the $850,000 in jewelry and furnishings.[6]

From the Tabors' schedules, it is not entirely clear which items overlap with the category of "jewelry and furnishings" on the 2008 financial statement.  The plaintiffs' suspicion stems primarily from the difference between the total value shown on the 2008 financial statement and the significantly smaller values shown for similar personal property in the Tabors' schedules.

Mr. and Mrs. Tabor testified credibly that most of the jewelry Mrs. Tabor had in 2008 had been sold, and some of it was stolen, prior to their filing this bankruptcy case.  In support of these statements, they produced sales receipts.  Mr. Tabor testified that it was Mrs. Tabor who provided the figure for "jewelry and furnishings" on the 2008 financial statement, and

---

[6] The evidence includes an additional personal financial statement issued by the Tabors in 2007 which states a $600,000 value for "jewelry and furnishings."  The Court focuses on the 2008 personal financial statement as it indicates a larger difference in value compared with the values shown in the Tabors' schedules filed in this case.

they testified that she included in that sum the value of substantial renovations completed on a condominium they owned at the time. The plaintiffs argue that it was not appropriate for Mrs. Tabor to include the cost of renovations as they claim that sum should have been included in the value of the condominium itself, and not included with items of personal property. Whether such value was appropriately included in the category "jewelry and furnishings" is beside the point as the credible testimony supports the conclusion that it was. The Tabors no longer owned the condominium when they filed their bankruptcy petition.

The Court notes that the $850,000 entry on the 2008 financial statement for "jewelry and furnishings," while a large sum, was only 1.34% of the Tabors' indicated total assets at the time. It is unlikely anyone preparing or reviewing the financial statement paid much attention to that item.

The Tabors satisfactorily explained what happened to the assets that they no longer had when they filed this bankruptcy case in 2014. There are no assets that are not accounted for by their testimony and/or documents in evidence. The Court received no material evidence that would cause it to doubt those conclusions.

**Alleged False Oaths**

The plaintiffs claim that the Tabors made false oaths by failing to properly reflect in their schedules of assets and liabilities, and their statement of financial affairs ("SOFA"), interests in the Porsche, the Tabor Agency, and the proceeds from the mortgage on the Sailfish Point house. As is apparent from the discussion of these matters above, the Tabors made no false oaths.

When Mr. Tabor made his initial filings with this Court, he did not realize that he had personally co-signed the Porsche lease. Because he did not then know that he had an interest in the Porsche, he did not knowingly omit the car or related payments from his disclosures.

Mr. Tabor did not have an equitable interest in the Tabor Agency. There was no interest to disclose and so he could not have made a false oath by failing to list it.

Mr. Tabor assigned the mortgage on the Sailfish Point house to the Trust as collateral for loans made by the Trust to Mr. Tabor's business enterprise. Because the loans made by the Trust were intended to preserve pending real estate projects for the ultimate benefit of the Tabors' creditors, it was appropriate for Mr. Tabor to use the Sailfish Point mortgage loan as collateral. When the Trust was unable to collect on those loans, it properly realized on its collateral and received the proceeds from the sale of the Sailfish Point home. The Trust did not pursue Scott for a deficiency on the Sailfish Point mortgage as Scott was unable to pay it, and he was a beneficiary of the Trust in any case. When the Tabors filed this bankruptcy case, they had no interest in the mortgage loan proceeds and so their failure to list any such interest was not a false oath.

Shelley had provided the Tabors with a loan secured by a mortgage on their homestead. In the SOFA, the Tabors failed to list mortgage payments to her in the proper place for payments to insiders. But they did list the mortgage loan obligation with Shelley's name and also listed the monthly payment amount. The Tabors testified credibly that they relied on their prior bankruptcy counsel when preparing these documents and that they provided him with all relevant documentation. The Court concludes that in failing to list the mortgage loan payments to Shelley in one place, the Tabors did not intentionally do so and so did not make a false oath.

The plaintiffs also argue that Mr. and Mrs. Tabor failed to list as income loan payments received from Mercedes and gifts received from Shelley and Tracy. Mr. and Mrs. Tabor testified that they believed those items were not income as contemplated in the relevant schedule. The Court found that testimony credible and concludes that the Tabors did not intend to deceive creditors by not listing those amounts as income.

At trial, Mrs. Tabor testified that she signed the schedules and SOFA without reviewing them, instead relying on her counsel to have filled out the documents properly based on information the Tabors provided. The plaintiffs argue that this indicates a reckless disregard for the truth tantamount to an intent to deceive. In light of all the relevant evidence, including the credible testimony of both Mr. and Mrs. Tabor, the Court finds that neither of them intended to deceive the Court, the trustee, or creditors.

At an examination under Fed. R. Bankr. P. 2004 earlier in the bankruptcy case, Mr. Tabor testified that the lease and insurance payments for the Porsche came from his mother, Bernice. In reality, the Tabor Agency obtained funds from the Trust at the request of Shelley and part of the brokerage commission from the sale of the Palm City property, which funds were used to make those payments. When he testified at the Bankruptcy Rule 2004 examination, Mr. Tabor then believed that the Tabor Agency was the sole lessee of the vehicle and viewed the Tabor Agency as Bernice's entity. Mr. Tabor did not know at that time that the Trust provided the Tabor Agency with funds to make payments relating to the Porsche.

In their post-trial brief, the plaintiffs ask the Court to consider certain of the Tabors' testimony during the trial itself as additional false oaths. As discussed below, the Court will not deem the Third Amended Complaint to be further amended to include these allegations. Even if the Court were to consider the plaintiffs' false oath allegations relating to testimony during the trial itself, the evidence taken as a whole does not indicate that Mr. or Mrs. Tabor knowingly testified falsely during the trial. Having carefully observed their testimony, and considering all of the other evidence, the Court concludes that Mr. and Mrs. Tabor believed what they were saying when testifying at trial and that they testified truthfully.

## CONCLUSIONS OF LAW

**Motion to Amend Third Amended Complaint under Fed. R. Civ. P. 15(b)(2)**

In their post-trial brief, the plaintiffs seek to amend multiple counts of the Third Amended Complaint under Fed. R. Civ. P. 15(b) made applicable here by Fed. R. Bankr. P. 7015. Rule 15(b)(2) permits a party to amend its pleadings to conform to the evidence "when an issue not raised by the pleadings is tried by the parties' express or implied consent." Implied consent arises when a party fails "to object to evidence raising issues outside of the pleadings … as long as the evidence is not relevant to issues already within the pleadings."[7] If evidence is presented at trial without objection, and that evidence supports a new theory for relief not addressed in the complaint, the complaint may be amended to reflect the new theory for relief because the defendant is deemed to have consented. But if the evidence presented at trial was relevant to any theory already presented in the complaint, it would be unfair to deem the failure to object a consent because the defendant would have no reason to object to evidence relevant to a claim presented in the complaint. In such an instance, the complaint will not be deemed amended to add the new theory for relief.

In their post-trial brief, Mr. and Mrs. Tabor objected to most of the plaintiffs' requests to amend the Third Amended Complaint to conform to the evidence. In each instance where the Tabors objected, the Court finds that the evidence pointed to by the plaintiffs was relevant to issues already raised in the Third Amended Complaint. In those instances, the Tabors' failure to object during trial does not amount to their consent to those requested amendments. To the extent the Tabors objected to amendment under Rule 15(b)(2), the plaintiffs' requests to amend will be denied. Where the Tabors did not object, the Third

---

[7] United States *ex rel.* Seminole Sheet Metal Co. v. SCI, Inc., 828 F.2d 671, 677 (11th Cir. 1987).

Amended Complaint will be deemed amended. This issue is addressed as appropriate in connection with each count, below.

### Counts I, II, and III: 11 U.S.C. § 727(a)(2)

11 U.S.C. § 727(a)(2)(A) requires denial of discharge if the objecting party establishes

> (1) that the act complained of was done within one year prior to the date the petition was filed, (2) with actual intent to hinder, delay, or defraud a creditor, (3) that the act was that of the debtor, and (4) that the act consisted of transferring, removing, destroying, or concealing any of the debtor's property.[8]

Section 727(a)(2)(B) requires denial of discharge as a result of the same acts concerning property of the estate after the petition date. Transfers outside the one-year period before the bankruptcy petition can lead to denial of discharge if the debtor continues to conceal the property within the one-year period before the petition date or after filing.[9] The objecting party must prove actual intent to hinder, delay, or defraud creditors. Constructive fraud does not satisfy section 727(a)(2).[10]

Considering the evidence as a whole, taking into account the consistently credible testimony of Mr. Tabor, Mrs. Tabor, Shelley, Tracy, Scott, Brett, Mercedes, and William, the Court concludes that the plaintiffs failed to meet their burden of proof on the issue of intent under counts I, II, and III of the Third Amended Complaint. This is the case even if the Court granted the plaintiffs' motions to amend the Third Amended Complaint under Rule 15(b)(2) in their entirety. The plaintiffs ask the Court to question the reliability of each of these witnesses, pointing to alleged inconsistencies at trial and in certain of their testimony prior to trial. Having observed their testimony at trial and having closely reviewed the plaintiffs' and the Tabors' arguments on these issues, the Court is satisfied that the claimed

---

[8] Jennings v. Maxfield (*In re* Jennings), 533 F.3d 1333, 1339 (11th Cir. 2008).
[9] *See* Coady v. D.A.N. Joint Venture III, L.P. (*In re* Coady), 588 F.3d 1312, 1316 (11th Cir. 2009).
[10] *See* Equitable Bank v. Miller (*In re* Miller), 39 F.3d 301, 306 (11th Cir. 1994).

inconsistencies are adequately explained by the context of the questions and the witness's knowledge and understanding at the time of the testimony. The plaintiffs' attempts to pick apart their statements did not cause the Court to doubt the trial testimony of any of Mr. Tabor, Mrs. Tabor, Shelley, Tracy, Scott, Brett, Mercedes, or William.

In count I, seeking denial of discharge under section 727(a)(2)(A), the plaintiffs allege that Mr. Tabor concealed interests in the Trust, the proceeds from the mortgage on the Sailfish Point home, the Porsche, and the Tabor Agency. Mr. Tabor established the Trust more than a year before the bankruptcy filing. Likewise, the satisfaction of the Sailfish Point mortgage occurred more than a year before the petition date. The plaintiffs allege that Mr. Tabor continued to conceal his interest in the Trust and the proceeds from the Sailfish Point mortgage. Note that the Third Amended Complaint alleged that Mr. Tabor concealed the proceeds from the Sailfish Point mortgage loan, not an interest in the mortgage loan itself.

As discussed in detail in the Court's findings of fact, none of these claims are supported by the evidence. Mr. Tabor had no interest in the Trust to conceal. Mr. Tabor properly assigned his interest in the Sailfish Point mortgage loan to the Trust to secure loans to his real estate enterprise in hopes of bringing his existing deals to fruition and paying all of his creditors. When the real estate enterprise was unable to repay those loans, the Trust accepted the proceeds from the sale of the Sailfish Point home, then its collateral, in partial satisfaction of the loans. Mr. Tabor had no right to the proceeds and so had nothing to conceal. In any case, the proceeds from the Sailfish Point home were paid to the Trust more than 2 years before the bankruptcy filing, so there were no proceeds that could have been concealed within 1 year before the filing. Mr. Tabor did not realize that he had a personal interest in the Porsche lease, believing until after his bankruptcy filing that the Tabor Agency was the only lessee. While Mr. Tabor was listed as the broker for the Tabor Agency and was

a signatory on its bank account, he had no equitable interest in the Tabor Agency, which remained solely in the control of Bernice until her death after this bankruptcy case was filed.

In their post-trial brief, the plaintiffs seek to amend count I to include continuing concealment of an interest in the Sailfish Point mortgage loan itself (in addition to the proceeds as alleged in the Third Amended Complaint). The Tabors objected to this request. As the relevant evidence also related to allegations Mr. Tabor concealed an interest in the Trust and the proceeds of the mortgage loan, matters already presented in the Third Amended Complaint, the issue of continuing concealment of an interest in the Sailfish Point mortgage was "not tried by the parties' express or complied consent." The Court will deny the plaintiffs' request to amend count I to include a claim based on continuing concealment of an interest in the mortgage loan itself. But even if the Third Amended Complaint was amended to include the requested theory, the evidence does not support relief. As discussed in detail in the Court's findings of fact, Mr. Tabor properly assigned his interest in the Sailfish Point mortgage loan to the Trust to secure loans to his business enterprise. Mr. Tabor did not retain an interest in the mortgage loan that could have been concealed.

In count III, seeking denial of discharge under section 727(a)(2)(B), the plaintiffs allege that Mr. Tabor concealed the same interests listed in count I, plus an alleged interest in the broker's commission from the sale of the Palm City property, after the bankruptcy filing. In their post-trial brief, as with count I, the plaintiffs seek to amend count III to add a claim based on the alleged concealment of an interest in the Sailfish Point mortgage loan itself. In this instance, however, the Tabors did not object. The Court deems the Third Amended Complaint further amended to include in count III a claim based on the alleged post-petition concealment of an interest in the Sailfish Point mortgage loan.

The Court's analysis of the claims in count I applies equally to the relief requested in count III with regard to the same alleged property interests. The amended claim relating to

the Sailfish Point mortgage loan itself is covered by the Court's analysis regarding the proceeds from that loan. The only alleged interest pointed to in count III not addressed in count I is the commission from the sale of the Palm City property. The Trust agreed to pay a commission as a result of work done by Yahel. The commission was paid to the Tabor Agency because Yahel was not herself a broker, only an agent. The Tabor Agency paid part of the commission to Yahel and used the remainder to make payments related to the Porsche. At all relevant times, Bernice was the sole owner of the Tabor Agency. The portion of the brokerage commission that remained with the Tabor Agency was usable in her discretion. That Bernice permitted those funds to be used in connection with the Porsche does not mean that Mr. Tabor had any personal interest in the Palm City commission. Mr. Tabor could not conceal an interest he did not own. The plaintiffs did not meet their burden of proof on any aspect of the relief requested in count III, as amended.

In count II, seeking denial of discharge under section 727(a)(2)(A), the plaintiffs allege that Mrs. Tabor took out a loan on and gave a lien on her previously unencumbered, aging Jaguar with the intent to hinder, delay, or defraud creditors. This was the least convincing claim presented in the Third Amended Complaint, and the evidence was unsurprisingly lacking. Mrs. Tabor has not had a career outside her home. She devoted her adult life to raising her three children and caring for her household. At the time she took out a loan on her vehicle, she had already sold all of her valuable jewelry, including her engagement ring, to assist the couple in meeting their financial needs. She testified credibly that she obtained the loan because doing so was one way she could help pay their bills. That Mr. and Mrs. Tabor had consulted with a bankruptcy lawyer prior to her taking out the car loan does not change the Court's view on this issue. There was no evidence offered that Mrs. Tabor obtained advice that she would be better off having an encumbered vehicle if and when they filed bankruptcy. Indeed, there was no evidence that Mrs. Tabor realized that was the case.

27

More troubling, the plaintiffs' suggestion that the timing of the loan raises suspicion casts aspersions on the Tabors' initial bankruptcy counsel.  The Court will not conclude, without evidence, that he potentially violated the rules of ethics by providing such advice.  The plaintiffs argue that the balance in the Tabors' personal bank account does not jibe with Mrs. Tabor's testimony.  But the balance in their account on any particular date is not persuasive. It was clear that when Mrs. Tabor took out the car loan the Tabors had few resources to pay their normal expenses.  The plaintiffs did not meet their burden of proof on count II.

**Count IV: 11 U.S.C. § 727(a)(3)**

Section 727(a)(3) requires denial of discharge where a debtor unjustifiably failed to keep and preserve records detailing the debtor's financial condition and business transactions for a reasonable period before filing.[11]  Under section 727(a)(3), the objecting party bears the initial burden of proving deficient recordkeeping.  The debtor then bears the burden of demonstrating adequate justification.[12]  The complexity of a debtor's finances, the debtor's education, and the debtor's business sophistication, among other factors, informs whether the circumstances justify a debtor's failure to keep and preserve records.[13]

In Count IV of the Third Amended Complaint, the plaintiffs allege that Mr. and Mrs. Tabor failed to keep or preserve records "from which [the] disappearance of hundreds of thousands of dollars in furnishings can be ascertained."[14]  The allegations focus only on records relating to "furnishings" the Tabors had several years before they filed bankruptcy. In their post-trial brief, the plaintiffs argue that the values given for "jewelry and furnishings" in the 2008 personal financial statement, compared with the values provided in their schedules filed in this case, indicate a loss of assets that is not reflected in records

---

[11] *See* 6 COLLIER ON BANKRUPTCY § 727.03 (16th Ed. 2021).
[12] *See In re* Hahn, 362 B.R. 542, 548 (Bankr. S.D. Fla. 2007).
[13] *See Id.*
[14] Cmpl. ¶ 126.

retained by the Tabors.  The allegations in the Third Amended Complaint do not align with the argument presented in the post-trial brief.  But even if the Court considers the evidence offered in connection with both jewelry and furnishings, the Court concludes that the Tabors retained appropriate records, including records relating to the sale of jewelry, to answer the plaintiffs' allegations in count IV.

In any case, the plaintiffs waived relief under count IV.  During closing argument, when addressing the claims in count IV, counsel for the plaintiffs stated:  "We won't be going forward with the document one."[15]  For this independent reason, the plaintiffs are not entitled to relief under count IV.

## Count V: 11 U.S.C. § 727(a)(4)(A)

Section 727(a)(4)(A) requires denial of discharge if a debtor knowingly and fraudulently made a material false oath or account in or in connection with their bankruptcy case.[16]  Omissions from the schedules or SOFA, if knowing and fraudulent, can result in denial of discharge.[17]  False oaths are material if they relate to the debtor's financial situation and business transactions or to the discovery, disposition, or existence of assets and property.[18]

The objecting party must show that the debtor knew the statement was false and made it with the intent to deceive.[19]  A series of false statements, evidencing a reckless disregard for the truth, can support the inference of fraudulent intent.[20]  A debtor's failure to

---

[15] Trial Transcript p. 1297 l. 11-13.
[16] *See Swicegood v. Ginn*, 924 F.2d 230 (11th Cir. 1991).
[17] *Id.*
[18] *See* Chalik v. Moorehead (*In re* Chalik), 748 F.2d 616, 618 (11th Cir. 1984).
[19] *See In re* Kempff, 847 F.3d 444, 449 (7th Cir. 2017).
[20] *See* Stamat v. Neary, 635 F.3d 974, 982 (7th Cir. 2011).

review filings prior to signing them may show a reckless disregard for the truth.[21]  However, good faith reliance on the advice of counsel may negate a finding of fraudulent intent.[22]

In the Third Amended Complaint, the plaintiffs allege that the Tabors made false oaths as follows:  in the schedules, Mr. Tabor did not disclose his interest in the Porsche or the source of lease and insurance payments; during an examination under Bankruptcy Rule 2004, Mr. Tabor testified that the Porsche lease and insurance payments came from his mother, Bernice; Mr. and Mrs. Tabor appeared to testify differently about Mrs. Tabor's motivation in taking out the loan on her Jaguar; in the schedules and SOFA, Mr. Tabor did not disclose his equitable interest in the Trust, the Tabor Agency, or the proceeds from the mortgage on the Sailfish Point home; and the Tabors did not disclose mortgage payments to Shelley in that part of the SOFA covering payments to insiders.

The evidence does not support any of these claims.  When they completed their schedules, Mr. Tabor did not realize that he had co-signed the Porsche lease.  Believing that the Porsche was leased solely by the Tabor Agency, he did not list the car as his own.  Because Mr. Tabor thought the Tabor Agency was the sole lessee, that the Tabor Agency paid the lease and insurance payments was not responsive to any component of the schedules or SOFA.  When Mr. Tabor previously testified that Bernice paid the Porsche lease and insurance, this was consistent with his understanding that her company, the Tabor Agency, was responsible for those expenses.  Any inconsistencies between Mr. and Mrs. Tabor's testimony regarding why Mrs. Tabor took out the loan on her Jaguar are not material and, in any case, the plaintiffs did not argue this component of count V in their post-trial brief. Mr. Tabor did not have an equitable interest in the Trust, the Tabor Agency, or the proceeds from the Sailfish Point mortgage, and so his failure to list those items in the schedules was

---

[21] *See* Retz v. Samson (*In re* Retz), 606 F.3d 1189 (9th Cir. 2010).
[22] *See* First Beverly Bank v. Adeeb (*In re* Adeeb) 787 F.2d 1339, 1343 (9th Cir. 1986).

appropriate.  In any case, the plaintiffs failed to address those claims under count V in their post-trial brief.  That the Tabors did not list mortgage payments to Shelley in the SOFA as payments to an insider is not a material misstatement as they disclosed both the existence of the mortgage claim held by Mr. Tabor's sister and the amount of the payments.  Their failure to include those payments elsewhere in the SOFA was an oversight.

In their post-trial brief, the plaintiffs allege additional false oaths not included in the Third Amended Complaint.  These include:  the alleged failure to disclose payments received from Mercedes, Shelley, and Tracy; Mr. Tabor's testimony at a February 2016 deposition regarding certain payments received from Mercedes; Mrs. Tabor's testimony at trial regarding the theft of her jewelry; and Mr. Tabor's testimony at trial about the Tabor Agency's finances.  In their post-trial brief, Mr. and Mrs. Tabor objected to the Third Amended Complaint being amended to reflect these additional claims.  Because the evidence pointed to in support of the new theories for relief was relevant to issues already presented in the Third Amended Complaint, these issues were not "tried by the parties' express or implied consent" under Rule 15(b), and the Court will not consider the proposed additional claims.  But even if the Court considered all of these new theories under count V, the plaintiffs would not meet their burden of proof.  Each of these additional matters was appropriately responded to by the Tabors and the Court is convinced that Mr. and Mrs. Tabor did not knowingly and fraudulently mislead anyone on these issues.

**Count VI: 11 U.S.C. § 727(a)(5)**

Section 727(a)(5) requires denial of discharge to debtors who fail to satisfactorily explain "any loss of assets or deficiency of assets to meet the debtor's liabilities."  The

objecting party bears the initial burden of proving a loss of assets.  The burden then shifts to the debtor to provide a satisfactory explanation.[23]

As with count IV, the plaintiffs point to personal financial statements provided by Mr. and Mrs. Tabor at least 6 years before the bankruptcy filing as compared with assets disclosed in their schedules in this case.  In count VI of the Third Amended Complaint, the plaintiffs allege the Tabors failed to satisfactorily explain a loss of "furnishings" reflected in their financial statements, without mentioning jewelry.  In their post-trial brief, the plaintiffs refer to both "jewelry and furnishings."  Mr. and Mrs. Tabor did not object to this apparent expansion of the claim presented in count VI, and so the Third Amended Complaint is deemed further amended to reflect the claim as presented in the plaintiffs' post-trial brief.

As more fully discussed in the Court's findings of fact, the Tabors satisfactorily explained what happened to the assets that they no longer had when they filed this bankruptcy case in 2014.  There are no assets that are not accounted for by their testimony and/or documents in evidence.  The Court received no material evidence that would cause it to doubt that conclusion.  The plaintiffs did not meet their burden on count VI.

**Collateral Estoppel**

In their post-trial brief, Mr. and Mrs. Tabor argue that certain of the Court's findings when it denied a motion to dismiss their bankruptcy case as a bad faith failing are entitled to collateral estoppel effect in this adversary proceeding.  *See* ECF No. 295, Case No. 14-20731.  In light of the Court's analysis above, it is not necessary for the Court to address whether any findings previously made by the Court are binding here.

---

[23] *See* Hawley v. Cement Indus. (*In re* Hawley) 51 F.3d 246, 249 (11th Cir. 1995).

## CONCLUSION

The plaintiffs did not meet their burden of proof on counts I, II, III, V and VI, and waived relief under count IV.  Even if the plaintiffs had not waived relief under count IV, they did not meet their burden of proof on count IV.  The Court will deny all relief requested in the Third Amended Complaint (as amended after trial to the extent provided in this Memorandum Opinion) and will enter separate judgment in favor of the defendants, Martin Tabor and Abby Tabor, on all counts.

###

Copies furnished to all parties of record by the Clerk.